Good morning, Your Honors. Brian Layton on behalf of the plaintiff and appellant Julie White. I'd like to save a substantial amount of my time for rebuttal in this matter. This case comes to you on the district court's granting the appellee Digex's motion for summary judgment. This court, the standard of review is de novo. Since the district court granted the motion for summary judgment brought by Digex, the district court was required to weigh all of the evidence in the light most favorable to Julie White, the nonmoving party. This court is obligated to do the same thing. This is kind of a rather sad case of taking advantage of the only young woman in this entire team, requiring her to be on call 24 hours a day, seven days a week, the only female to have to do that, and then ding her, put her on separate probation, and then terminate her because she would come in late on occasion and sometimes not come in at all, even though her spineless supervisor is the one that told her, I recognize you're working long hours, you don't have to come in today, or you can come in late and then turn around and tell his supervisors on the East Coast that Julie just didn't show up, and so she was terminated as a result of that. What she was actually terminated for, and the evidence shows that she was terminated because she complained about the fact that she was not getting overtime. She complained about the fact that there was gender discrimination in that she was the only one that was required to do this 24-7, 24 hours a day. The district court looked at it and in a footnote weighed the evidence, which he could not do, and applying an illegal standard, if you will, by saying, well, since she was single, she volunteered to do this. Well, volunteering to work overtime is not a defense for the employer. This court recently, three years ago, in that Bothell versus Fays metric cited throughout both of my briefs, states that the employer has the burden of establishing the application of the exemption, the exemption from overtime, and the court must construe exemptions narrowly against the employers. The position, in this case Julie White's position, must plainly and unmistakably fall within their terms and spirit. Now, the district court judge correctly found over the objections of DigEx that Julie White was not an administrative or an executive with DigEx. She couldn't hire, she couldn't fire, had no personnel management, had nothing to do with the business. She was a grunt, an employee. But he found that she was a professional and found that she was primarily involved in intellectual, creative positions and exercised discretion. And he found that she exercised discretion because when she was working at 2 o'clock in the morning, she was unsupervised. So she had to exercise discretion. That's like saying a mechanic that gets called in at 2 o'clock in the morning to fix a vehicle exercises discretion because the boss wasn't there. Julie White was not experienced in this field. She acquired the skill while she was there. This court in Bothell said acquiring a skill on the job does not make one a professional. She acquired a skill. All she did was tell Pandesic, lead Pandesic through while their server was down and tell them how to get it up and running. She was the one that was called at 2 o'clock and 4 o'clock in the morning. It was very time critical to Pandesic because apparently people shopped 24 hours a day on the Internet. Pandesic supplied the service to like Adidas and Ford so people could shop 24 hours a day. And if the servers went down, they had to get them up and running, and that was Julie White's job. Did she my understanding is she was the principal point of contact with one of DIJEC's largest clients? The largest client of DIJEC's on the West Coast was Pandesic. And she was the principal point of contact with that client? Well, when she started off, there was nine employees that were taking care of the West Coast. Several of them were working on the Pandesic account because Pandesic was the largest. They then in March of 2000 dropped the number of employees from nine to four, changed her title, didn't change her job duties. Listen, I understand your arguments, your jury arguments. My question is simply focused, was she not the principal point of contact with one of the defendant corporation's largest clients? That is true. That is true. And when they called after hours and had a problem with their server, she was the one that told them how to fix it? Yes. Now, if that occurred after hours, the next day, was she required to go to some supervisor and say, here's what I did? What she was required to do is because she had a computer at home, she had a computer at work. The computer at home would show when she logged on to help the Pandesic, when she logged off. Those log-in, log-offs were then sent somehow to the company so her supervisor would see when she logged on and when she logged off. She would log on to help Pandesic, log off when she was done helping Pandesic. So the supervisor was aware of what she did because every step on the log-in, log-off would state what she did to get the server up and running. Try X, try Y. Actually, in this record, is there, were there any instances where a supervisor said, I looked at your log-on, log-offs last night and the solution you suggested for our client was not the correct one, you should have done X? What the record does show, no, Your Honor, but the record does show that there were occasions when Julie could not help, and so she would call the East Coast team, who were above her in knowledge and capability, and they would do it. But there isn't anything in the record that somebody told her the next day that what you did was wrong, but I don't think the question was ever asked. It appeared as though she was able to get the problem fixed very quickly because it was time sensitive, or that somebody above her on the East Coast, and they operated 24 hours a day, was able to get the server up and running to the satisfaction of Pandesic. It's hard in the computer world, isn't it, to determine, you know, this kind of issue that we're talking about in this case. Well, I don't think it's... And even a car mechanic these days has to be computer literate. They do, but that doesn't mean they're exempt from overtime. Now, the... Can you, did she have stock, was she given stock options? Did she what? Was she given stock options? Half the amount the men were given. But she had stock options. She got stock options. So she had a stake in the company. I mean, I just, I have a relative who has received lots of worthless stock options in I.T. companies, and I know that it's very common in the industry to do that. But I don't normally think, I'm just curious about industry practice. There may not be anything in this record. I haven't searched it, but... No, there is something... I'm not familiar with, generally, with someone being determined to be a grunt employee who was entitled to overtime and also being given a stake in the company by way of stock options. It seems it's a disconnect to me. The stock options she got were worth less than $1,000. And this was after one year. She was supposed to get bonuses. The men did. She did not. But we have to look at exactly what she did, and it has to be unmistakable and clear that she fits within the exempt category. Now, one of the things that would assist us is the California courts and the federal courts say when it's under California law, we will look to the Federal Code of Federal Regulations and see and use their language and their interpretation. And at page 32 of my brief, I point out of my opening brief, that the federal government has 29 CFR 541.303, and they're talking about whether someone is a professional or not in the computer area. And subsection D says, this exemption does not include employees engaged in the operation of computers or the manufacture, repair, or maintenance of computer hardware and related equipment. Now, she didn't even. What are you reading from? I'm sorry. Excuse me? What were you reading from? I didn't get it. Oh, page 32 of my brief that is quoting 29 CFR 541.303, which is the federal equivalent, which the California courts follow. Now, she didn't even do that. She didn't do repair or maintenance. She didn't design the websites. She did not sell the servers. She did not design the software for Pandesic. It's like if your Westlaw computer goes down and you call somebody at Westlaw or somewhere else saying, hey, I can't do this. Well, did you do this? Try this step. Try that step. That, under all the levels of reading, is not considered a professional, particularly if you look at Bothell and particularly if you look at the other cases cited between 32 and 39 of my opening brief and also in my responsive brief where they say acquired skill, on-the-job acquired skill does not make one a professional. Now, the primary case cited by Digex is Palacio v. Progressive Insurance Company. I apologize to the Court. When I cited it in my brief, I added a 244 fed second. It's 244 fed sub second. It's a district court case. In that case, the central district court found that this person was a professional and, therefore, exempt from overtime. But in that case, this person who worked for the insurance company communicated with attorneys, witnesses, doctors, and negotiated settlements on behalf of the company. Julie White could do nothing except get on her computer and tell Pandesic how to bring their server back. That was her only job 24-7. When the court determines that the district court erred in finding she was not an exempt employee and, therefore, entitled to overtime, then it's a domino effect as to the district court's granting summary judgment as to all of her other claims. He claimed that on the retaliation claim, it wasn't a retaliation for gender discrimination or for complaining about overtime and the shift differentials that she was promised, but because she was tardy and late. The record shows abundant evidence, which the district court unfortunately waived in violation of summary judgment standards and said, well, it looks like she was late and tardy, and, therefore, that was a good reason to terminate her, not because she was complaining about overtime, because she's not entitled to overtime. Is it – this is in no way meant to be a rhetorical question. Okay. So correct me if the factual assumption is wrong. Is it your argument that there's sufficient evidence of pretext, or at least a material question of fact as to pretext, based on the dispute between her contention that she was told she could come in late or not at all and the supervisor denying that? There is enough evidence to take it to the jury where a jury could find, which, of course, is summary judgment standards, a jury could find that it was a pretext. Because she was being given overtime until they dropped five employees, made them four employees, changed her title but kept her job the same. The only problem is, is because with four employees instead of nine, she just had to work 18 hours a day. So at that point, when she says, hey, I'm not getting paid for overtime, they said, well, because of your new title, you're not entitled to overtime. And she says, well, then, if I'm not entitled to overtime, why am I the one that is working so much, not getting overtime, yet the male employees are getting job training, they're getting bonuses, they are getting more stock options than me, what's going on? Because she was working so many hours, she would call her boss, Don Piombo, who would say, come in late, don't come in at all. But he never reported. He reported the opposite, never recorded that he told her that. She thought everything was okay. Didn't she sign some write-ups? Yes, because she was required to sign the write-ups, whether or not she agreed with them or not, otherwise she would be terminated. They said that you can make your own statement, which she did, and DigEx never provided that. And Discovery said they couldn't find them. The HR manager, Seema Kapoor, had left, didn't know where she was, and those were not produced in Discovery. But she did write up her own separate statement, didn't keep a copy of it, and DigEx did not provide them in Discovery. And I'd like to reserve the rest of your time for rebuttal. Yes, thank you very much. Good morning. May it please the Court. My name is Annie Rogaski of Townsend & Townsend & Crewe, appearing on behalf of Appley DigEx, Incorporated. Most of the issues raised in this appeal and referred to by Mr. Leighton can be resolved by the legitimate reason for DigEx's termination of Ms. Whitehead. And that legitimate reason is for continued attendance problems. The evidence shows, the evidence that is competent and not hearsay or conclusion or speculation, shows that Ms. White was disciplined increasingly but continually, and according to DigEx's policies, for her attendance and tardiness. Now, this increased over time because her attendance problems did not resolve. Initially, she received three verbal warnings. She then received a written warning in May of 2000. Her attendance problems continued. She received more verbal warnings. This was all while she was supervised by Mr. Piambo. Mr. Piambo then left in June of 2000. Her attendance problems continued. She received more verbal warnings from her new supervisor, Mr. Alami, and Mr. Alami was the one who placed her on a performance improvement plan in August of 2000. Ms. White signed the performance improvement plan. It doesn't say she agrees with the terms. It says she understands those terms. She admitted in her deposition that she understood that if she violated that performance improvement plan, she would be terminated. The letter of the performance improvement plan says in two places, if you violate this, you will be terminated. She knew that, and yet two more times, only two weeks later, after signing the performance improvement plan, she was late without first calling in to advise that she would be late. That was an express violation of the performance improvement plan. She admitted that she violated that performance improvement plan twice. In the first case, she was late for the job. In the second case, she was late for the job.  In the fourth case, she was late for the job. In the fifth case, she was late for the job. Ms. White did not argue that she was late. Her performance improvement plan did not say that.  DigEx followed through on its policy and terminated her employment. Did the record reflect whether there was a connection between her extra-hour work and her tardiness? As you read the blue brief, you get the impression that, well, you know, if she's up till two or three hours late, she's not going to be able to get a job.    I don't believe that there is admissible evidence to that effect. I just wondered if the record, if there's ever been any analysis of the connection between the late hours and the tardiness. I'm sure that if she does work late, that it would be hard to get in in the morning. However, she was just required to call in. If she worked until 2 in the morning, she could have left a voicemail for her supervisor saying, I can't make it to work, I'm here at 2 a.m., I'm not going to make it in by 8. She didn't do that. Judge Gamby's question, which I have also, is whether either side in this litigation has done any analysis of a factual connection between overtime hours and tardiness or absence. I don't believe so, Your Honor. There are no allegations also with respect to the time that Mr. Alami was Ms. White's supervisor, in July and August of 2000, that she had the same issue, that she worked overtime and Mr. Alami somehow told her that that was okay, she didn't need to come in in the morning. She doesn't. She may, in other words, she may have had some contentions about Piombo sanctioning this behavior, but Mr. Alami, she makes no contention about that? She makes no contention about Mr. Alami. We dispute whether she has admissible evidence about the statement she has made about Mr. Piombo as well. But she does make those allegations against Piombo, not against Mr. Alami. The legitimate reason for Digix's termination of Ms. White's employment resolves the majority of causes of action in this case, as they were resolved on summary judgment below. With respect to retaliation, wrongful termination, discrimination, even if Ms. White had sufficient evidence to prove a prima facie case, which Digix admits she does not, the legitimate reason for her termination places the burden back on Ms. White to demonstrate pretext, and she cannot prove pretext. She has identified no inconsistent reasons for her termination, as some of the cases cited in the briefs had. She has identified nothing that Mr. Alami may have said to her that would indicate his termination of her employment was for any reason other than her attendance at the court, and she cannot prove pretext.  The legitimate reason for her termination is that she has not been involved in any of these problems. Because she cannot prove pretext, each of those causes of action for retaliation, wrongful discrimination and wrongful termination should fall, as they did in the district  Watching this television commercial the other night about, you know what the geek squad is? The what? You know what the geek squad is? You've seen the commercials, these Volkswagen Beetles drop out of the sky. A person is at home working on their computer, and it freezes up or whatever, and they scream and yell and parachutes, and these Volkswagen Beetles occur, and this geeky looking guy, whatever that is, walks up to the door holding a badge, and this is the problem. I get the impression that this woman was no criticism intended of either the company or the employee, that that was really her function, that when this client had a problem with its server, she was supposed to be available day or night to help them resolve the problems with their server, and it would all be done online. She would post onto their computer and fix the problem, right? I don't believe so. How does that make her a professional? First of all, with respect to the fact that you set forth, I don't believe that she was expected to be on call 24 hours a day, seven days a week. Put that aside. Okay. Wasn't her job to respond to the call from the client and resolve server problems? She did resolve server problems. The answer to that is yes, isn't it? Yes. Okay. And she did this by logging on or hosting on or whatever the proper word is onto their computer, and it was done online, correct? Correct. It's the broadband equivalent of her driving up to their front door and walking in and sitting down at the computer, the server, and helping them solve it there, right? That is effectively what she was doing, and that is similar. How is she different from the Maytag repairman or the brake guy down at Braco or with respect to overtime? Well, the Maytag man or the Xerox repair person that was the example provided in appellant's briefs, they are different in a number of respects. One, they engage in manual work, not intellectual work. And one of the requirements to be helped. I was under the impression you get on that computer keyboard too long and you can have all sorts of problems with your wrist. You're saying that's not mechanical? I'm saying that her responsibility was thinking through problems and solving them with her knowledge and expertise, not physically working with a machine to fix it with her hands. Her job was solely intellectual. It was not a physical. Yes, she does have to type, but all of us every day, if I pick up this binder, I'm doing some manual work, and yet I'm still considered to be an exempt employee. That's because you've got a law degree, kid. Did the record reflect that she actually did log into their computer to correct it, or is she on the phone talking them through it? Evidence really wasn't submitted on that specific point. I do believe, based on her declaration, that she did sometimes log in from home. She sometimes logged in from work. I think she did both. But to work on the client's computer, she's connecting to it. We don't know, do we? Or whether she's just talking them through it. I am not sure. There's no evidence in the record on that specific point. When I look at the federal regulation on computer, people who are professionals, there's no question, if you're designing systems, you're a professional. Probably even if you're creating software programs and so on, you're a professional. But it's hard for me to see that it comes down necessarily to what she did. Are there factual disputes about exactly what she did? I don't think what she did was in dispute. There's agreement between the parties that she would receive a problem from Pandestic and that she would work through that problem. Now, she has said at least three times in her declaration that she was the only one that Pandestic could rely upon to solve her problems, that it was only her. And if it's only her, then she must have some knowledge and some expertise that others at DigX do not have. Well, that's true, but that's true. That can easily be true of people who are not highly skilled in the sense of being professionals. Her background was in bartending and waitressing. She did have a little bit of computer experience immediately before coming to DigX. This sort of cries out as a gender-based problem. It seems it has some earmarks of that. Was there ever an EEOC complaint filed or any kind of counseling or dispute resolution along those lines attempted here? While she was employed or after? Either one. She made a complaint of sexual harassment while at DigX, and she went through the formal procedures there. She admitted that any harassment that would have occurred resolved as of June 2000. The indications in her declaration suggest that those were not the complaints against her were not based on her gender but were based upon her work, and indeed that's what the district court found below. Afterwards, Ms. White did go through the administrative channels after she terminated her employment and received a right to sue letter, and then the suit was filed after that. I have a question, but before I ask it, let me apologize for using the word kid. I shouldn't. You're a professional because you're a law school graduate and you're a licensed attorney, and I think you're probably specifically exempt under this overtime provision that we're dealing with. Let me ask this question. When she logged on and helped solve the client's problems, that would be automatically reported or available to her supervisors, correct? It was logged in the computer system. I don't know that a screen popped up in her supervisor's computer saying what she was doing. And to the extent this was done in overtime, later at night, whatever, the next day when a supervisor came in, that information would be available to look at and assess, correct? I believe that's correct. Were there ever any instances in which supervisors either praised or criticized her or offered constructive comments of any kind about the specific actions she had taken with respect to helping solve the client's problems? The only thing in the record that might address that is one e-mail. I don't believe it was from a supervisor. I believe it was another person on her team where she had sent an internal e-mail string to a customer, to Pandesic, and he said that's not our policy, you should not be doing that. Okay. With that aside, is it correct to say that as far as this record is concerned, there were no either adverse or positive or constructive criticism-type comments about the actions she took with respect to the client? That's correct. I'm not trying to assess whether she did a good job or not, just whether at any point in time a supervisor looked at the specific actions she undertook and said that was good or you could have done this or you should have done that. There's nothing in the record to that effect. Doesn't that support the argument that she's more mechanic than professional? I don't believe so, Your Honor, because she, the fact that she was trusted to work after hours suggests she must have demonstrated that she could handle the job and could make good decisions while working during normal work hours. The fact that she wasn't, that there was no supervisor looking over her shoulder is the opposite of the Bothell case, where for any trivial decision whatsoever, the repairman in that case had to call his supervisor, even when he was off-site. There's no indication in the record whatsoever that Ms. White had to call her supervisor to report in, to get permission to do anything. She was absolutely trusted to handle this client, and she made clear in her declaration she was the only one capable of doing that. She was a technical account manager. She was effectively a computer systems analyst. She analyzed the computer system to figure out where the problem was and get the system back online. Now, the computer system analyst under the 2000 wage order, which does not govern here, she doesn't fit precisely that requirement under the later wage order. But the 1998 wage order, which did govern her employment, is more general. Under that order, it simply says you have to meet these three threshold requirements. You have to have primarily intellectual work. You have to engage in independent judgment and discretion. And you have to meet a threshold wage level, which she did. Nothing more is required by the letter of the 1998 wage order. In contrast, in 2000, there are additional requirements above and beyond those three requirements to show whether you are professional, executive, or administrative. Now, in 1989, there was a wage order, which was attached to the appellant's brief, that has the same test as the 1998 wage order that governs here. And in 1989, the Industrial Welfare Commission said the professional exemption has been too strictly construed, that you don't require just a license. It's not just a license. It's something more than that. Now, they didn't give guidance about every possible situation you could have, but they did talk about the fact that we have emerging occupations, such as high technology and science, and that we have relied too much on credentialism. So that suggests that the 1989 and the 1998 wage orders, which governed her employment, were broader, encompassed more than the 2000 wage order that covered computer systems analysts. Even if she didn't meet that 2000 wage order, she should have been found, and she was found, a professional employee under the 1998 wage order. Yes. Roberts. Let me ask this. I understand your argument on the wrongful termination to be that she signed on to the performance improvement plan, and that irrespective of the legitimacy of the factual understandings or conclusions, the company came to institute that plan. She agreed to it and then violated it, and that's sufficient nonprotectual cause for termination. I understand that, okay? Okay. Are there cases that deal with whether the decision to subject an employee to an improvement plan constitutes an adverse employment action? The Bartolini case had similar facts. In Bartolini, that had a wrongful termination allegation. I was just looking for some help to see whether there are cases that say up or down, and there may not be any, that the decision to institute a worker improvement plan can or cannot constitute an adverse employment action. I think generally you are permitted to have two different tracks. You may be disciplining someone, and if they make a complaint, that doesn't mean you have to stop your discipline, because it might be perceived that you are retaliating against them or wrongfully terminating them. You are entitled to continue down that track and continue to discipline your employee. In the Villarimo case cited in these briefs, in that case there was a violation and the employer said, if you violate that policy one more time, you will be terminated. He also had a sexual harassment claim, and he was terminated. He was terminated because of the violation of the policy. That case was a little bit different, because there was about a year and a half between the first complaint and the termination. So even if the decision to institute such a plan is made on the basis of pretext or some basis that's not approved under traditional standards of employment law, once the plan is in place, a violation of it is enough to permit discharge. In the absence of some evidence showing some other reason for the termination, I believe so, Your Honor. And there's no such evidence here. Thank you. Thank you. Your time has expired. In answering Your Honor's question, in this court, in Bethel v. Faye's metrics, in talking about the fact that Bethel was deemed not a professional, or at least it should go to the jury, and they reversed the summary judgment in favor of the employer, this court, and I quote at page 1128 of that opinion, and it's page 5 of my reply brief, under his version of the facts, Bethel was the high-tech equivalent of the Xerox machine man who meets and confers with customers to identify the problems, diagnose the malfunction, formulates a work plan, repairs the equipment based on procedures established by the manufacturer, and fills out a field service report to enable his employer to bill for the work. They found under that scenario that would not be a professional. To answer another question that the court ---- Did they send that to the jury? What? That last case you just read from? No. No, it was reversed. The judge in Bethel had granted the employer summary judgment, and it went up to this court, and this court reversed and said there are tribal issues. Okay. To answer Your Honor's question, prior to Julie White's employment here, she was a bartender and a waitress, and she worked for some time at a fiberglass ----  She acquired some computer skills where she worked for some small company for a few months and then applied for Digix. The one of the ---- How much overtime are we talking about here? We're talking about a significant hundreds of hours of overtime. And to answer another question is at page 15 of my blue brief, at paragraph 16, which is quoting verbatim Julie White's declaration in opposition to the motion for summary judgment, Digix identified various dates. This is on paragraph 16, and it begins that excerpt of Record 44, her declaration does, which date she was tardy and which date she didn't show up. Julie White then explains that the exhibit shows that while I was out sick on April 14, 2000, the previous four days I had worked 57 hours. I worked 17 hours on April 20, 2000, which is a date they said she came in late. She still worked 17 hours that day. I worked eight hours on May 5. I may have been late on May 11, but I worked 19 hours that day. I may have been late on May 12, 2000, but I had worked the previous nine days straight, so it was probably a regular day off. I may have been late on May 24, 2000, but I did work for 20.5 hours that day. And it goes on and on and on. These are the dates that she either missed work or she came in late, and she's still putting in 20.5 hours that day or the night before. Now, to answer another question from this court, at page 22 of the blue brief, which, again, is quoting verbatim from paragraph 23 of Julie White's declaration, to answer your honors question, midway, a third of the way down on page 22, it says, Don Piombo had access to my log-on and log-off hours on the computer dealing with Pandesic's problems because that was one of the services that DigEx provided its customers, including Pandesic, who wanted to know when Pandesic called, what its problem was, and when the problem was resolved, and knew that I was the one that was taking care of their problems, whether it be 11 p.m. or 4 a.m. And she had this on, and there's another part of this declaration, and I could find it if it's important to the court, is the paragraph 20 on page 18 says, I plain and simply walked Pandesic through why their server was having problems. I would have a computer at work and at home. When Pandesic would call with a problem relating to one of their servers being down, I would walk them through the steps to get their server up and running. I was under a time crunch to get that done since Pandesic, et cetera, et cetera. Well, all the log-in, log-off, what the problem was, when it was solved and how it was solved, was all available to her supervisor. And to answer a question, she got very rave reviews throughout her tenure there from Pandesic, the client she was supposed to – Your Honor, I was going to say something. Your time is just about up. Oh, I'm sorry. I just wanted to ask you one question. Okay. On the lesser pay, the district court said that she offered no admissible evidence that she was qualified to receive compensation equal to that of her male counterparts. And then it says, Indeed, some of the male members of her team had considerably more experience than she in the field of computer maintenance and troubleshooting. Does that mean that some of them didn't? That means – I don't know exactly. No. Everybody there had more experience than she did. Yeah. Yeah. They were all computer geeks, if you will, to use Your Honor's word. And then the last thing, and I apologize, is the – one of the key things that my colleague here says is that Julie was trusted to do the job, and so she could do it at home. Well, if that is the rule to determine somebody's exempt from overtime is because you're a good employee and you do a good job, then heaven help overtime law. Okay. Thank you very much. Thank you. The case just argued is submitted for decision. We'll hear the next case, which is Brown v. New York Life. Thank you. All right. Now, we have –
judges: Schroeder, Canby, Hawkins